[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14635

_____

D.C. Docket No. 3:03-cv-00237-TJC-TEM

WILLIAM GREG THOMAS,

Petitioner - Appellant
Cross Appellee,

versus

ATTORNEY GENERAL, STATE OF FLORIDA,
SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondents - Appellees
Cross Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 31, 2015)

Before ED CARNES, Chief Judge, and MARCUS and WILLIAM PRYOR,
Circuit Judges.

MARCUS, Circuit Judge:

In this capital case, William Greg Thomas appeals from the district court's

denial of his federal habeas petition.  In 1994, Thomas was sentenced to death by

the Florida courts for the murder of his wife, which he orchestrated to avoid paying his part of a divorce settlement.  After a series of unsuccessful attempts to pursue state postconviction remedies, Thomas eventually filed a federal habeas petition in the United States District Court for the Middle District of Florida.  The district court held that Thomas's petition was untimely, but that he was entitled to equitable tolling in light of his attorney's egregious misconduct.  Ultimately, however, the district court denied him relief on the merits.

We now have before us a motion from the Attorney General of Florida to limit briefing to the question of equitable tolling, as well as a motion from Thomas to stay the current briefing schedule until the resolution of the Attorney General's motion.  After thorough review of the entire record, however, we conclude, sua sponte, that the proper course is to remand this case to the district court to make additional and detailed findings of fact concerning Thomas's claim to equitable tolling, including exactly what may have happened and, most importantly, why counsel did not timely file this § 2254 petition.  Moreover, the district court is directed to apply these findings of fact to the changing landscape in the law of equitable tolling, found in the Supreme Court and this Court's recent cases: Holland v. Florida (Holland II), 560 U.S. 631 (2010), Maples v. Thomas, 132 S. Ct. 912 (2012), and Cadet v. Fla. Dep't of Corr., 742 F.3d 473 (11th Cir. 2014). Thus, among other things, the district court is obliged to ultimately answer whether

2

the conduct of Thomas's lawyer amounted to an "abandonment of the attorney-client relationship," Cadet, 742 F.3d at 481, or whether her alleged "bad faith, dishonesty, divided loyalty, [and] mental impairment," Holland v. Florida (Holland I), 539 F.3d 1334, 1339 (11th Cir. 2008), rev'd on other grounds, Holland II, 560 U.S. 631, nonetheless constitute grounds for equitable tolling.  Thus, we deny as moot the state's motion to limit briefing before this Court to equitable tolling and the petitioner's motion to stay the current briefing schedule.

## I.

The essential facts, as recounted by the Florida Supreme Court, are these:

> Thomas planned the kidnapping and murder of his wife, Rachel, in order to avoid paying his part of a settlement agreement in their pending divorce.  Thomas and a friend, Douglas Schraud, went to Rachel's house, September 12, 1991, the day before a substantial payment was due, and Thomas beat, bound, and gagged Rachel.  When Rachel tried to escape by hopping outside, Thomas knocked her to the ground and dragged her back inside by her hair.  He then put her in the trunk of her car and drove off.  She was never seen again.

Thomas v. State, 693 So. 2d 951, 951 (Fla. 1997) (per curiam).  Thomas was charged with first-degree murder, burglary, and kidnapping, and Richard Nichols was appointed to represent Thomas during his trial.  The jury found him guilty on all counts and recommended the death penalty by a vote of eleven to one.  The judge found five aggravating factors: (1) Thomas had previously been convicted of murdering his mother, Fla. Stat. § 921.141(5)(b); (2) the murder was committed in the course of a burglary, id. § 921.141(5)(d); (3) the murder was committed for

3

pecuniary gain, id. § 921.141(5)(f); (4) the murder was especially heinous, atrocious, or cruel, id. § 921.141(5)(h); and (5) the murder was committed in a cold, calculated, and premeditated manner, id. § 921.141(5)(i).  He imposed the ultimate sentence, and Thomas's conviction and sentence were affirmed on direct appeal.  Thomas, 693 So. 2d at 953.  Thomas unsuccessfully filed a motion for postconviction relief under Rule 3.850 of the Florida Rules of Criminal Procedure, see Thomas v. State, 838 So. 2d 535 (Fla. 2003), as well as a motion for re-sentencing under Ring v. Arizona, 536 U.S. 584 (2002), which failed as well.  During these postconviction proceedings, Thomas was represented by Dale Westling.

Thomas then sought habeas relief in federal district court.  On March 24, 2003, he filed an emergency motion requesting that a Florida attorney, Mary Catherine Bonner, be appointed to represent him in federal habeas proceedings.  The district court conducted a hearing on March 26 and, convinced that Bonner was qualified to represent the petitioner, appointed her as counsel on April 2.  Bonner, however, did not file a federal habeas petition on behalf of her client until almost a year later.  On June 4, 2003, the court ordered her to submit a status report within two weeks.  She filed two sealed status reports in June and July, attesting that she needed "at least six weeks additional time" to file the petition.  She also filed a series of sealed motions with the court, addressing investigative needs and

4

costs.  On February 19, 2004, the court -- having heard nothing from Bonner about the status of the petition for seven months -- ordered her once again to advise the court on the status of the case by March 15.  On that date, she responded and sought leave to file Thomas's habeas petition by March 19.  She eventually filed the petition on March 22, 2004.  The one-year statute of limitations for filing a habeas petition, see 28 U.S.C. § 2244(d)(1), however, had long since passed -- on June 18, 2003.

The state responded to Thomas's petition, asserting that it was time-barred. On January 18, 2006, the district court took argument on the issue of timeliness, and asked Bonner to explain why she did not file the petition in a timely manner. She explained that "the reason that I . . . allowed it to get close to the margin, and . . . perhaps over the margin, is that I felt that the court needed to be presented with all of the facts."  Specifically, she claimed to have needed additional time to investigate the circumstances of Thomas's plea in another murder case -- in which he pled guilty to murdering his mother (the "mother-murder case") -- as well as speak with several alibi witnesses.  Lastly, she argued that the limitations period should be equitably tolled for the time she needed to investigate these new claims. After the hearing, the district court appointed John Mills as co-counsel for Thomas, and directed the parties to file supplemental briefing on the issue of timeliness.

5

Ultimately, the district court concluded that Thomas's petition was untimely and that he was not entitled to equitable tolling. Thomas v. McDonough, 452 F. Supp. 2d 1203, 1212, 1218 (M.D. Fla. 2006). The court held that Thomas had shown no impediment to the filing of his state motion for postconviction relief or his federal habeas petition. Id. at 1213. Nor was Thomas entitled to equitable tolling simply because he had directed his attorneys to file his petition on time. Id. at 1216. Instead, the court reasoned, "[c]ounsel's decision to file late constitute[d] attorney negligence," which could not form a basis for equitable tolling. Id. at 1217. For these reasons, the court dismissed Thomas's petition with prejudice.

Thomas then moved for reconsideration. The court conducted argument on the motion on December 17, 2007, at which time Bonner, in the words of the district court, "blamed the mental and physical health of her husband and herself" for her failure to file the habeas petition in a timely fashion. As we see it, Bonner's statements were more equivocal. Bonner began her testimony by apologizing to the court, and acknowledged that the court felt "cheated because [she] made errors." She stated that she "had what [she] believed to be reasoned decisions for filing at the time" she did. But she also explained that her husband had suffered a stroke in November 2001 that "continue[d] to prey on [her], and . . . give context to the way [she] [felt] and the way [she] acted." She clarified that she was "not saying simply, you know, my husband had a stroke, therefore, I've made a

6

mistake." Instead, she indicated that the cumulative impact of her husband's and her own health issues may have put her under a significant amount of stress. However, she admitted that "I can't tell you whether and how that weight impacted on me." And she again stressed that she felt obliged to investigate issues Thomas had raised that were of "paramount dispositive importance."

Shortly after the hearing, the district court granted Thomas's motion for reconsideration and his request for an evidentiary hearing. In order to address equitable tolling, the district court took testimony from Thomas, Bonner, and Westling on February 21, 2008. In his testimony, Thomas provided a detailed account of his correspondence with Bonner. He testified, among other things, that Bonner sent him a letter on March 3, 2003, before she was appointed, stating that she believed the best course would be to file a petition for certiorari with the U.S. Supreme Court to "buy some time to file the 2254 [petition]." She explained that "it is horrible when we have to litigate timeframes rather than substance, but, alas, that is probably where we will find ourselves." Thomas believed that Bonner "knew everything she was talking about . . . and [his] appeal would be filed timely." In a letter dated March 19, Bonner instructed Thomas to file a pro se § 2254 petition, doing his best to copy the issues in his state motion for postconviction relief. Thomas claimed to have done so with the help of a paralegal, and sent Bonner a signed habeas petition dated April 3, 2003. Then, on

7

April 10, Bonner sent Thomas still another letter reiterating that "it would be better to file a Petition for Certiorari" to buy time to prepare Thomas's habeas petition so that "we will be ready to file virtually immediately" once certiorari was denied. Thomas understood her letter to mean "that she was on top of this, that the time bar issue was not a factor." Bonner, however, never filed a petition for certiorari from the state court's denial of postconviction relief.

Then, however, Bonner sent Thomas a letter on April 15 averring that the statute of limitations to file his federal habeas petition had already elapsed. Since the petition was "already untimely," she said she planned to "give it another week or so of preparation time." Thomas "figured that she lied to [him]." On June 4, Bonner mailed a letter to Thomas laying out the steps she was taking to prepare his petition, including the filing of a budget with the district court, which Thomas took to mean she "was totally on top of [the case]." On July 28, she wrote Thomas again, explaining this time that, "as you know, the dates . . . were gone long ago, and we have made a considered decision that to file a complete set of moving papers is the way to go." A year later, on June 21, 2004, Bonner wrote to Thomas to inform him that the state had asserted that his petition was untimely, but defended her decision to file when she did because "[w]e had to investigate; we had to follow your leads." She also said that the judge had given her time to

8

develop "a Constitutional attack . . . on the [statute of] limitations."  At no point did she mention her health issues to Thomas.

When Bonner took the stand, she was asked to explain her decisions and the conflicting representations she had made to Thomas.  She testified that she had "no idea exactly what made me come to the conclusion that [time] had run out."  She had previously believed that the statute of limitations would be tolled while a petition for certiorari to the U.S. Supreme Court was pending from Thomas's state postconviction proceedings.  As for the habeas petition Thomas allegedly sent to her, she testified that there "was no document filled out by him sent to me," and that the handwriting in the petition was her own.  She expressly adopted her statements regarding her and her husband's health issues at the December 17, 2007 hearing, and attributed her contradictory statements to these "very severe and very overwhelming" family issues.  However, she also testified that she made a considered "decision . . . to gather enough information for the court" to consider the issues that Thomas wished to raise.  And she agreed that she was "relying on the possibility that the court would forgive the untimeliness [of Thomas's petition] . . . based on an equitable argument."  She simply wished she "could go back and revisit" her decisionmaking within this difficult period.

After the hearing, the district court concluded that Thomas's petition was untimely, but that he was entitled to equitable tolling.  The district court

9

determined that Bonner had exhibited "bad faith," had made "untrue" representations, had "rendered disloyal service to her client," and had suffered from a "mental impairment." He also held that her egregious misconduct was an extraordinary circumstance that merited tolling, citing two cases from this Court. In the first case, Downs v. McNeil, we said that "[e]quitable tolling is a remedy that must be used sparingly," and reiterated that "mere attorney negligence will not justify equitable tolling." 520 F.3d 1311, 1318-19 (11th Cir. 2008) (quotation omitted and alterations adopted). The petitioner, however, alleged attorney misconduct that "ran the gamut from acts of mere negligence to acts of gross negligence to acts of outright willful deceit," and we held that if his allegations were true, they would merit equitable tolling. Id. at 1323. In the second case, Holland I, we articulated a more precise rule: attorney negligence, "in the absence of an allegation and proof of bad faith, dishonesty, divided loyalty, mental impairment or so forth on the lawyer's part," cannot by itself entitle a petitioner to equitable tolling. 539 F.3d at 1339.

Applying these principles, the district court found that Thomas had shown "an egregious pattern of misfeasance" by Bonner. As for bad faith, the court concluded that Bonner's willful failure to file a timely petition, "even with the prodding of the [c]ourt," rose above mere negligence to "the level of bad faith." As for dishonesty, the court simply observed that Bonner "wrote conflicting and

10

inconsistent letters to Thomas about the deadline," and made what he characterized as "untrue" representations to the court about when the petition would be filed. As for divided loyalty, the court explained that if, as the state suggested, Bonner "chose to miss the statute of limitations deadline on purpose" so that she could challenge the constitutionality of AEDPA's statute of limitations itself, "she has rendered disloyal service to her client." Lastly, as for mental impairment, the district court just observed that Bonner herself attributed her decisionmaking to "mental impairment she suffered as a result of a serious injury and 'very severe and very overwhelming' stress." The district court also concluded that Thomas had exercised due diligence, in that he "took all reasonable steps" to ensure the timeliness of his petition, particularly because he sent Bonner a "completed, signed habeas petition" well in advance of the deadline. The court, therefore, held that Thomas was entitled to equitable tolling. In a subsequent order on September 3, 2013, the district court denied Thomas relief on the merits of his claims.[1] This timely appeal followed.

---

[1] Thomas raised eight claims on the merits: (1) he was denied due process of law when he was not informed that his registry counsel could not attack his plea in the mother-murder case; (2) he was denied the effective assistance of counsel because his trial counsel, Nichols, contrived to prevent any review of his ineffectiveness in the wife-murder case by negotiating a plea in the mother-murder case wherein Thomas waived any right to raise guilt-phase issues arising out of the wife-murder case; (3) the facts surrounding Thomas's plea in the mother-murder case also establish that counsel was ineffective; (4) the instructions and argument presented to the jury diluted the jury's sense of responsibility for sentencing, and counsel was ineffective for failing to litigate this issue; (5) counsel was ineffective for failing to conduct an adequate investigation or

II.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes a one-year statute of limitations period for filing a federal habeas petition challenging a state court judgment.  28 U.S.C. § 2244(d)(1).  Equitable tolling of AEDPA's time bar "is an extraordinary remedy limited to rare and exceptional circumstances and typically applied sparingly."  Cadet, 742 F.3d at 477 (quotation omitted).  A petitioner is entitled to equitable tolling only if he shows both "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  Holland II, 560 U.S. at 649 (quotation omitted).  As the Supreme Court has recently reminded us, "[equitable] [t]olling based on counsel's failure to satisfy AEDPA's statute of limitations is available only for 'serious instances of attorney misconduct.'"  Christeson v. Roper, 135 S. Ct. 891, 894 (2015) (quoting Holland II, 560 U.S. at 651-52).

The district court applied the law extant at the time it considered Thomas's habeas petition, as explicated in Downs and Holland I.  However, since the district court issued its order, subsequent cases in the Supreme Court and in this Court have substantially altered the landscape of equitable tolling and, in particular, have

prepare for trial; (6) the jury was prejudiced when the prosecutor dropped a "hangman's noose" on the table, and defense counsel was ineffective for failing to object; (7) counsel was ineffective for failing to advise Thomas that his guilty plea in the mother-murder could serve as an aggravating circumstance in the wife-murder case; and (8) Florida's sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584.

shed light on the concept of extraordinary circumstances.  Thus, we have explained that attorney negligence, and even gross negligence or recklessness, is not an extraordinary circumstance; "abandonment of the attorney-client relationship . . . is required."  Cadet, 742 F.3d at 481.  At the same time, the factors we had identified in Holland I -- "bad faith, dishonesty, divided loyalty, [and] mental impairment," 539 F.3d at 1339 -- may still serve as extraordinary circumstances that support a claim to equitable tolling.  On remand, therefore, the district court must decide whether Bonner's conduct amounted to an abandonment of Thomas, as that concept has developed in Holland II, Maples, and Cadet, or whether her conduct nonetheless amounted to serious instances of attorney misconduct warranting equitable tolling.

First, the district court must consider Holland II, in which the Supreme Court reversed our decision in Holland I and provided new guidance regarding how courts should conduct the extraordinary circumstances analysis.  560 U.S. 631.  In Holland II, the Court agreed that "§ 2244(d) is subject to equitable tolling in appropriate cases."  Id. at 645.  The Court also reiterated that "a simple 'miscalculation' that leads a lawyer to miss a filing deadline does not warrant equitable tolling."  Id. at 651-52 (citation omitted).  Rather, a petitioner must show "egregious" attorney misconduct.  Id. at 651.  The Supreme Court, however, rejected the rule we had fashioned for determining when attorney misconduct

13

merits equitable tolling. The Court explained that the standard we applied was "too rigid," in that it excluded instances of professional misconduct that, while egregious, did not involve the conduct we had specifically singled out. Id. at 649-51. The Court therefore implied that misconduct which met our standard in Holland I would still constitute extraordinary circumstances. Id. at 652 ("[S]uch circumstances are not limited to those that satisfy the test that the [Eleventh Circuit] used in this case."). It also suggested that Holland had shown much more than "garden variety or excusable neglect." Id. at 652 (quotation omitted). But the Court, ultimately, remanded the case to allow us to determine in the first instance "whether the facts in th[e] record entitle Holland to equitable tolling," or whether additional fact-finding was required. Id. at 654.

Justice Alito concurred, but wrote separately to provide further guidance about the meaning of "extraordinary circumstances." He first observed that it was "abundantly clear that attorney negligence is not an extraordinary circumstance warranting equitable tolling." Id. at 655 (Alito, J., concurring). Attorneys, after all, occasionally make mistakes. In his view, the critical question was instead whether the attorney's mistake "is constructively attributable to the client and thus is not a circumstance beyond the litigant's control." Id. at 657. He emphasized that Holland claimed to have been "essentially 'abandoned'" by his attorney. Id. at 659. "Common sense dictates that a litigant cannot be held constructively

14

responsible for the conduct of an attorney who is not operating as his agent in any meaningful sense of that word." Id. Justice Alito expressly referred to agency principles in defining the concept of abandonment, including the rule that a principal is often not held responsible for an agent's disloyal conduct. Id. at 659-60. He then agreed with the majority that the proper course was to remand the case back to the lower courts to determine whether equitable tolling was required. Id. at 660.

Next, in Maples v. Thomas, the Supreme Court considered a distinct, but similar question: whether the attorney conduct in that case provided "cause" to excuse a procedural default. 132 S. Ct. 912. Maples was represented by two New York attorneys who, without any notice to Maples, left their firm and sought employment elsewhere while his Alabama state postconviction proceedings were pending. Id. at 916. As a result, Maples was unable to timely appeal the state court's denial of postconviction relief. Id. at 917. The Court began by noting the "general rule" that "when a petitioner's postconviction attorney misses a filing deadline, the petitioner is bound by the oversight and cannot rely on it to establish cause." Id. at 922. "A markedly different situation is presented, however, when an attorney abandons his client without notice, and thereby occasions the default." Id. Notably, the Court thought that Justice Alito's concurring opinion in Holland II had "homed in on the essential difference between a claim of attorney error,

15

however egregious, and a claim that an attorney had essentially abandoned his client." Id. at 923.  And the Court saw "no reason . . . why the distinction between attorney negligence and attorney abandonment should not hold" in both the context of procedural default and the context of equitable tolling. Id. at 923 n.7.  Holland, after all, had essentially raised a claim of abandonment. Id. at 923.  The Court, therefore, "agree[d] that, under agency principles, a client cannot be charged with the acts or omissions of an attorney who has abandoned him." Id. at 924.  Because Maples had plainly shown that he was abandoned by his attorneys, the Court held that he provided "ample cause" to excuse his default. Id. at 927.

Lastly, in Cadet v. Fla. Dep't of Corr., we were obliged to reconsider our equitable tolling jurisprudence in light of the Supreme Court's rulings in Holland II and Maples.  742 F.3d 473.  Cadet's attorney failed to conduct any research to determine when his habeas petition was due, yet repeatedly assured him that the petition would be filed in a timely manner. Id. at 475-76.  After recounting the analysis in Holland II and Maples, we asked whether "attorney error that amounts to gross negligence is a sufficiently extraordinary circumstance for equitable tolling purposes . . . or whether the attorney's conduct must amount to an abandonment of the attorney-client relationship." Id. at 480.  We decided that the Holland II opinion "must be read in light of the Court's explanation of [Holland II] eighteen months later in its Maples decision," which expressly relied on Justice

16

Alito's distinction between attorney negligence and abandonment.  Id.  We held, therefore, that "attorney negligence, however gross or egregious, does not qualify as an 'extraordinary circumstance' for purposes of equitable tolling."  Id. at 481.  Rather, "abandonment of the attorney-client relationship, such as may have occurred in Holland, is required."  Id.  Because Cadet's attorney "did not withdraw from representing Cadet, renounce his role as counsel, utterly shirk all of his professional responsibilities, or walk away from their attorney-client relationship," Cadet was not entitled to equitable tolling.  Id. at 484.

As we see it, Holland II, Maples, and Cadet have recast the concept of "extraordinary circumstances."  These three cases instruct that an abandonment analysis is required when evaluating a claim to equitable tolling based solely on attorney negligence, whether simple or gross.  The relevant inquiry today is not whether an attorney's mistake or oversight was egregious.  Instead, the question is whether the attorney, through her conduct, effectively abandoned the client.  Because the district court's decision in this case predated Holland II, Maples, and Cadet, the court did not have the opportunity to determine whether Thomas was abandoned by Bonner.  On remand, the district court must consider whether Bonner's conduct amounted to an "abandonment of the attorney-client relationship," so that her errors may not be attributed to Thomas.

17

At the same time, the factors we identified in Holland I -- "bad faith, dishonesty, divided loyalty, [and] mental impairment," 539 F.3d at 1339 -- involve attorney misconduct of a different character than negligence, and may still be relevant to the extraordinary circumstances analysis.  After all, the Supreme Court explained in Holland II that "although the circumstances of a case must be 'extraordinary' before equitable tolling can be applied, . . . such circumstances are not limited to those" that we had previously mentioned.  560 U.S. at 652 (emphasis added); see also Christeson, 135 S. Ct. at 894 (explaining that equitable tolling is reserved for "serious instances of attorney misconduct" (quotation omitted)).  We need not, and do not, decide conceptually whether bad faith, dishonesty, divided loyalty, and mental impairment fall under the umbrella of abandonment, or instead amount to independent reasons that equitable tolling may be appropriate in a particular case.  These factors may suggest that Thomas had been effectively abandoned by his attorney, and should not be held responsible for her error, or may otherwise constitute circumstances that are extraordinary and rare enough to warrant equitable tolling.  It is enough to say that these factors may still form the basis of an equitable tolling argument.

Thus, on remand, the district court is directed to consider the intervening changes in the law of equitable tolling, as found in Holland II, Maples, and Cadet.  Specifically, the district court must determine whether Bonner's conduct rose to

18

the level of abandonment, or whether her alleged bad faith, dishonesty, divided loyalty, and mental impairment nonetheless constitute grounds for equitable tolling.

### III.

On remand, the district court must make specific and detailed factual findings to support any conclusion that equitable tolling may be appropriate in this case. The district court found only that Bonner's "egregious . . . misconduct" amounted to an extraordinary circumstance, and that Thomas was "sufficiently diligent" to establish an entitlement to equitable tolling. The district court also appeared to conclude that "bad faith, dishonesty, divided loyalty, [and] mental impairment," the factors we highlighted in Holland I, 539 F.3d at 1339, were present. However, the district court stated these conclusions at the highest level of abstraction and, in particular, did not make specific, detailed findings regarding the historical facts surrounding Thomas and Bonner's interactions. On remand, the district court must lay out these critical historical findings of fact -- the what, the how, and most importantly, the why -- to aid in this Court's appellate review.

For starters, we cannot tell from the district court's order why Bonner untimely filed Thomas's habeas petition and, therefore, whether she exhibited "bad faith" or "divided loyalty." Plainly, bad faith and divided loyalty may in some circumstances serve as grounds for equitable tolling. But, without knowing more

19

about why Bonner filed Thomas's petition late, we cannot assess whether those determinations are correct. The court's opinion and the record extant suggest at least four possible explanations for Bonner's behavior, or perhaps some combination of them: (1) Bonner simply made a mistake in calculating the deadline; (2) Bonner determined that she needed more time to prepare a complete federal habeas petition and strategically decided to rely on equitable tolling to excuse the petition's lateness; (3) Bonner's decisionmaking was significantly affected by a real and substantial mental impairment at the time; and (4) Bonner missed the deadline as part of a deliberate strategy to challenge the constitutionality of AEDPA's one-year statute of limitations, either to prolong this litigation for the benefit of her client, or because she was interested in invalidating AEDPA's statute of limitations itself.

In our view, the answers to these questions matter a great deal. If Bonner simply wanted more time to prepare the petition, and was willing to risk the petition's untimeliness, that may well have been a strategic (if mistaken) decision for which Thomas may be held accountable.[2] On the other hand, if Bonner

---

[2] The district court also mentioned that "[n]otably absent from Ms. Bonner's statement was whether she advised her client of her 'strategy.'" However, in one letter to Thomas, Bonner stated that the petition was "already untimely," and that she would "give it another week or so of preparation time" to present the strongest possible case. On remand, the district court should make specific findings regarding what Thomas was told by Bonner about her strategy. In directing the district court to make those findings, we do not mean to imply that a failure by Bonner to consult with Thomas would be grounds for finding that she abandoned him.

deliberately delayed filing the petition in order to use Thomas's case as a test case to challenge AEDPA's statute of limitations, without regard for the possible consequences for Thomas himself, that may indicate divided loyalty or bad faith on her part. See Cadet, 742 F.3d at 482 ("[T]he agency relationship between an attorney and his client can be severed . . . where counsel acts adversely to his client's interests or commits a serious breach of loyalty to the client." (emphasis added)). Notably, the district court did not find that Bonner "rendered disloyal service to her client"; it concluded only that she had done so if the state were correct about her underlying motivations. Without an express finding of fact as to why Bonner filed Thomas's petition late, we cannot determine whether Bonner acted in bad faith or with divided loyalties.

As for dishonesty, the district court did not find that Bonner acted dishonestly, nor did the court identify any specific willful misstatements made by Bonner that would support a finding of dishonesty. See Downs, 520 F.3d at 1322-23 (explaining that "counsel's overt deception" about the status of the petitioner's case can constitute an extraordinary circumstance). The district court stated only that Bonner "wrote conflicting and inconsistent letters to Thomas about the deadline." We cannot tell on this record whether these letters reflect a deliberate attempt to mislead Thomas regarding the status of his petition, or simply reflect a combination of Bonner's own ignorance about the filing deadline and her evolving

21

views about how best to present Thomas's case.  The district court also noted that Bonner repeatedly told Thomas and the court that she intended to file the petition in a matter of weeks, but failed to do so.  But the court did not discuss whether Bonner knew at the time she made these statements that the petition would not be forthcoming.

As for mental impairment, the district court again did not make a <u>finding</u> that Bonner was so impaired that it affected her decisionmaking.  The court merely credited Bonner's statement that she suffered from "'very severe and very overwhelming' stress," and noted that mental impairment was specifically mentioned as a relevant factor in <u>Holland I</u>.  We do not doubt that in some circumstances, counsel's severe mental impairment may serve as an extraordinary circumstance, at least where the petitioner is able to show that it affected his lawyer's work.  See <u>Chavez v. Sec'y, Fla. Dep't of Corr.</u>, 647 F.3d 1057, 1071 (11th Cir. 2011) (denying equitable tolling where petitioner presented "no allegations at all that [counsel]'s health had affected his ability to handle the case"); <u>Robertson v. Simpson</u>, 624 F.3d 781, 785 (6th Cir. 2010) ("[W]hen a petitioner seeks to prove that the mental incapacity of his or her attorney warrants equitable tolling . . . , he must demonstrate that [the impairment] affected his ability to file a timely habeas petition."); <u>Fogg v. Carroll</u>, 465 F. Supp. 2d 336, 346 (D. Del. 2006) (granting equitable tolling where "counsel was facing the most

severe and distracting distress" as a result of a "progressively debilitating," and eventually fatal, illness).  The district court, however, did not find that Bonner was impaired, let alone that her mental impairment was of such severity that it substantially affected her ability to handle Thomas's case.

Details about the nature and severity of Bonner's alleged impairment are critical to determining whether extraordinary circumstances exist in this case.  We cannot tell from the record extant whether Bonner was suffering simply from stress or some more serious condition that was triggered by an understandable struggle with her and her husband's health issues.  Nor do we have any expert psychiatric or psychological testimony addressing the issue of mental impairment.   At times, Bonner herself has suggested that stress was not the cause of her decisionmaking.  Indeed, during the hearing on December 17, 2007, Bonner insisted that she was "not saying simply, you know, my husband had a stroke, therefore, I've made a mistake, therefore," and said that she could not "tell [the court] whether and how that weight impacted on me."  And she maintained that "I really still do think that I was right on the law."  Without knowing more about any claimed mental impairment, we are hard-pressed to decide whether Bonner was so impaired as to excuse the late filing of Thomas's petition.

Finally, the district court provided little factual detail to support its determination that Thomas was "sufficiently diligent" in pursuing his rights.  The

23

court simply stated that "[t]he record demonstrates that [Thomas] was actively participating with his counsel . . . and took all reasonable steps to ensure the timeliness" of his petition, and referred to Thomas's testimony at the February 21 hearing, where he explained the letters sent to him by Bonner.  The court, however, did not identify which steps Thomas actually took, other than sending a "completed, signed habeas petition" to Bonner in April 2003.  Nor can we tell from the record whether Thomas did anything else to ensure that his petition would be timely filed in response to Bonner's "conflicting," and perhaps even dishonest, letters.  Cf. Holland II, 560 U.S. at 653 (explaining that Holland "not only wrote his attorney numerous letters . . . [but] also repeatedly contacted the state courts, their clerks, and the Florida State Bar Association in an effort to have [his lawyer] . . . removed from his case," and filed his petition pro se "the very day" he found out "his AEDPA clock had expired"); Melson v. Comm'r, Ala. Dep't of Corr., 713 F.3d 1086, 1089 (11th Cir. 2013) (per curiam) (holding that the petitioner had not exercised reasonable diligence where he "took no independent steps to ensure that his federal habeas petition was timely filed").  While we take no position on whether Thomas indeed acted with due diligence, our review would be helped by a more comprehensive account of his interactions with Bonner prior to the filing of his petition.

24

In sum, on remand, the district court must provide a more thorough account of the facts of this case, including those which shed light on Bonner's decisionmaking, her understanding of the AEDPA filing deadlines, her mental health, and any actions Thomas may have taken to ensure the timeliness of his petition. After laying out the basic facts of this case in greater detail -- most particularly, why Bonner failed to file the petition in a timely manner -- the district court must consider whether those facts support Thomas's claim to equitable tolling in light of the changing landscape of this law. Specifically, the district court must tell us whether the facts in this case show that Bonner effectively abandoned Thomas by her conduct, as the concept of abandonment is explicated in Holland II, Maples, and Cadet, or whether Bonner's conduct otherwise amounted to serious misconduct that constitutes an extraordinary circumstance. We imply no view on whether Thomas is, in fact, entitled to equitable tolling. We leave that question, as well as the decision to conduct additional fact-finding, to the district court in the first instance. The Attorney General's motion is, accordingly, denied as moot. We also deny as moot the petitioner's motion to stay the current briefing schedule.

25

**VACATED AND REMANDED with instructions.**[3]

---

[3] Today, we consider only the district court's decision on equitable tolling, and not the district court's judgment on the merits of Thomas's claims. Thus, we remand for the limited purpose of allowing the district court to address the question of equitable tolling once more.